UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| D.A. and J.A., on behalf of themselves and as legal guardians and parents of M.A., an individual with a disability,<br><br>        Plaintiffs,<br><br>v.<br><br>MERIDIAN JOINT SCHOOL DISTRICT NO. 2,<br><br>        Defendant. | Case No. 1:12-cv-00426-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

This is an administrative appeal under the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1400 et seq. Plaintiffs D.A. and J.A., the parents of M.A. (a high school student diagnosed with high-functioning autism), seek review of Hearing Officer ("HO") Edwin Litteneker's decision entered in July of 2012. HO Litteneker upheld the determination by Defendant, the Meridian Joint School District No. 2 ("MSD"), that M.A. was not eligible for special education services and, on this basis, concluded M.A. was not denied Free and Appropriate Public Education under the IDEA.

This case is one of a trilogy of cases concerning M.A.'s educational needs. *D.A. and J.A. ex rel. M.A. v. Meridian Joint Sch. Dist. No. 2 and Indep. Sch. Dist. of Boise City* involved claims by M.A.'s Parents under Section 504 of the Rehabilitation Act as well as the Americans with Disabilities Act. D. Idaho Case No. 1:11-cv-00119-CWD (hereinafter "*D.A.-119*"). In that case, after a nine-day trial, a jury determined M.A. was not denied a Free and Appropriate Public Education ("FAPE") within the meaning of the Rehabilitation Act or the ADA. *D.A.-119*, Dkt. 127 (D. Idaho July 26, 2013) (Special Verdict). *Meridian Joint Sch. Dist. No.2 v. D.A. and J.A. ex rel. M.A.*, an appeal from the decision of HO Guy Price under the IDEA, presented the issue of whether M.A. was entitled to an Independent Education Evaluation ("IEE") at public expense after MSD denied M.A.'s Parents' request for such an evaluation. D. Idaho Case No. 1:11-cv-00320-CWD (hereinafter "*D.A.-320*"). There, the Court affirmed HO Price's conclusion that M.A. was entitled to an IEE at public expense.

The issue in this administrative appeal is whether, based on the IEE and other evaluations, M.A. is eligible for special education services from MSD. In particular, the Court must determine whether MSD's ineligibility determination met the IDEA's procedural and substantive requirements. On the procedural side, the primary issue is whether MSD infringed on Parents' right to meaningfully participate in the eligibility evaluation. The substantive issues boil down to whether a preponderance of the evidence demonstrates M.A. does not qualify for special education under the IDEA and the 2009 Revision of Idaho's Special Education Manual ("Idaho Manual"). For reasons explained more fully below, the Court will affirm HO Litteneker.

## BACKGROUND

In 2004, M.A.'s Parents moved from California to Idaho and enrolled M.A. at MSD. M.A. had received special education under the IDEA in California and his Parents provided MSD with information related to M.A.'s previous diagnoses of expressive-receptive language disorder, central auditory processing disorder, possibility of dyslexia and dysgraphia, and possibility of Asperger's disorder. M.A. received special education under the IDEA while enrolled in MSD from the fifth grade (2004-2005 school year) through the eighth grade (2007-2008 school year).

In April 2008, following M.A.'s three-year reevaluation by MSD pursuant to the IDEA, M.A.'s Individualized Educational Program ("IEP") team met and determined that M.A. was no longer eligible to receive special education services. In response, M.A.'s Parents, at their own expense, obtained an evaluation by Dr. Timothy Leavell, who diagnosed M.A. with Asperger's Disorder. M.A.'s Parents provided Dr. Leavell's report to MSD and requested that MSD conduct an evaluation of M.A. to reassess his eligibility for special education. MSD concluded that, rather than an IEP under the IDEA, M.A. would receive various accommodations at the start of his ninth grade year (Fall 2008) under Section 504 of the Rehabilitation Act.

In April 2009, M.A. was arrested and placed in the Ada County Juvenile Detention Center, where he remained incarcerated until September 2010 pursuant to a criminal sentence. During his incarceration, the Boise Independent School District No. 1 ("BSD"), the district in which the detention facility is located, assumed responsibility for educating M.A.. Following negotiations with M.A.'s Parents, BSD issued an eligibility report dated

February 2010, which found M.A. had strong indications of Asperger's disorder (high-functioning autism). However, the report concluded M.A. was not eligible for special education services, because there was no evidence that M.A.'s disabilities adversely affected his educational performance. The report also noted that BSD conducted its evaluation in a setting (the detention facility) where students were able to work at their own pace with individualized support under a flexible curriculum.

In late September 2010, seven days after his release from the detention facility, M.A. returned to Centennial High School in MSD as an eleventh grade student. Prior to his return, M.A.'s mother requested MSD conduct a comprehensive IEP evaluation. MSD denied this request because BSD had already determined M.A.'s disability did not affect his educational performance and because there was no indication that a reevaluation was necessary. M.A.'s Parents disagreed with this assessment and, in January 2011, formally requested MSD provide an IEE at public expense. In making this request, M.A.'s Parents contended the BSD evaluation was conducted in a highly structured environment and was not adequately reflective of M.A.'s needs at Centennial High School. MSD denied the request and filed for a due process hearing, seeking confirmation from a hearing officer that the evaluation conducted by BSD, and adopted by MSD, was appropriate and that M.A. did not qualify for special education services.

The assigned HO, Guy Price, presided over a three-week due process hearing and entered a Memorandum Decision and Order dated June 6, 2011. HO Price determined MSD inappropriately relied on the BSD evaluation because the detention center and Centennial High School presented dissimilar educational settings. But HO Price did not

reach the second issue raised by MSD: whether M.A. qualifies for special education

under eligibility criteria set forth in the IDEA and the Idaho Special Education Manual.

HO Price concluded a determination on the second issue was premature until MSD

completed an appropriate evaluation with the benefit of the IEE. MSD appealed HO

Price's decision in July 2011. In March 2013, the Court affirmed HO Price's decision,

concluding that M.A. was entitled to an IEE at public expense. *D.A.-320*, Dkt. 63 (D.

Idaho March 20, 2013). Final judgment in *D.A.-320* was entered on November 25, 2013.

*Id*. Dkt. 112.[1]

While *D.A.-320* proceeded before the Court, Parent's obtained—at their

expense—an IEE from Dr. Barbara Webb in August 2011.[2] Dr. Webb reviewed M.A.'s

educational records and based her evaluation on assessments by several other

professionals, including an occupational therapist, a speech-language pathologist, a

neuropsychologist, and a behavioral specialist. On September 13, 2011, M.A.'s Parents

delivered to MSD an Amended IEE that incorporated the evaluations noted above as well

as comments from teachers and professionals employed by BSD and MSD. The next day,

M.A.'s Parents formally requested an eligibility meeting.

After two follow-up meetings, MSD provided Parents with a referral for a special

education evaluation, the plan for that evaluation, and a consent form. However, the

eligibility evaluation did not begin until December 19, 2011, because MSD and M.A.'s

Parents could not agree on the terms of Parents' consent to the evaluation or the plan for

---

[1] On December 20, 2013, MSD appealed *D.A.-320* to the United States Court of Appeals for the Ninth Circuit.
[2] The cost of the IEE was awarded to M.A.'s Parents in *D.A.-320*.

evaluation itself. By the time M.A.'s Parents filed a request for due process hearing with MSD in January 2012, the seventeen-member eligibility team[3] had yet to determine whether M.A. was eligible for special education services.

M.A.'s Parents' initial due process complaint alleged, inter alia, MSD had not timely evaluated M.A. pursuant to Parents' request for a special education eligibility evaluation in September 2011. In response, MSD moved to dismiss the due process complaint or, alternatively, stay the administrative proceeding until MSD completed its eligibility determination. But, before these motions could be resolved, MSD determined, in late February 2012, that M.A. was not eligible for special education. This determination, detailed in MSD's Eligibility Report, (Dkt. 12, Resp.'s Ex. 708), was based on an extensive record of assessments and observations of M.A., including those made by M.A.'s mother and the third-party professionals who contributed to the IEE. Shortly thereafter, M.A.'s Parents filed a second due process complaint, this time challenging MSD's ineligibility determination.

The two due process complaints were consolidated into a single case, involving eleven contested issues. M.A.'s Parents challenged the substantive bases for MSD's determination as well as procedural matters such as timeliness of the evaluation and the adequacy of Parents' participation. HO Litteneker presided over a hearing on the

---

[3] The eligibility team consisted of a facilitator, M.A.'s mother, D.A., Centennial's Principal, an assistant principal, MSD's special education director, a special education department chair, a special education supervisor, the school psychologist, the school's speech-language pathologist, an occupational therapist, a counselor, three teachers, Parents' legal counsel and a paralegal, and MSD's legal counsel. (Dkt. 12, Resp.'s Ex. 708 at 2.)

consolidated matter, which spanned ten days from late April through late June 2012, included testimony from twenty-two witnesses, and involved hundreds of exhibits.

Prior to the hearing, HO Litteneker ruled against Parents on several motions and maintained these rulings upon reconsideration. Specifically, the HO declined to admit prior testimony and reports by Dr. Craig Beaver and Dr. Barbara Webb from the administrative proceedings underlying *D.A.-119* (the ADA and § 504 case) and *D.A.-320* (the IEE case). HO Litteneker was "not persuaded that there is any link for the purposes of determining the relevancy of Dr. Webb and Dr. Beaver's testimony in connection with this particular question as to whether the student is eligible for Special Education."[4] (Dkt. 12, Tr. 26:17-24.) In addition, the HO excluded prior testimony from several other experts retained by Parents, finding that Parents did not show these witnesses were unavailable and noting that many of their opinions were incorporated into MSD's eligibility evaluation. M.A.'s Parents also contested the HO's exclusion of certain testimony by M.A.'s peer mentor, which related to events before August 2011. Finally, HO Litteneker declined to compel production of certain test protocols administered by the Centennial High School psychologist, because there was no showing of relevance.

HO Litteneker issued his Findings of Fact, Conclusions of Law and Decision on July 5, 2012.[5] The HO thoroughly reviewed the facts regarding M.A. and his disability; MSD's eligibility determination, including the IEE and input from M.A.'s mother; and

---

[4] HO Litteneker did allow prior testimony to be used for impeachment purposes, however. (Dkt. 12, Pldg. 56 at 4 n.1.)

[5] On July 17, 2012, HO Litteneker issued amended Findings of Fact, Conclusions of Law and Decision, which omitted personally identifiable information. (Dkt. 1-3.)

M.A.'s participation in the general education curriculum at Centennial High School. He described the governing legal standards before making the following legal conclusions: (1) MSD conducted a timely eligibility evaluation; (2) MSD complied with the IDEA's Child Find requirements; and (3) MSD conducted a sufficient eligibility evaluation. HO Litteneker concluded the eligibility evaluation was sufficient because the substantial record indicated MSD:

> (a) considered the relationship between M.A.'s medical condition, however characterized, and his educational performance;
>
> (b) used a variety of assessment techniques;
>
> (c) considered the IEE results;
>
> (d) allowed for parental participation and considered parental input;
>
> (e) adequately assessed general skills; and
>
> (f) did not predetermine M.A.'s ineligibility.

Accordingly, HO Litteneker found for MSD on every claim asserted and denied Parents' requested relief.

In August 2012, M.A.'s Parents timely appealed the HO's decision to the Court. (Dkt. 1.) The Complaint requests an order reversing HO Litteneker's decision, a declaration that MSD violated the IDEA, compensatory damages for parent-funded support and assessments of M.A., compensatory education, attorney fees, costs, and such other relief as the Court may deem appropriate. (*Id.*) MSD provided a copy of the

administrative record to the Court on February 19, 2013.[6] Thereafter, the Court approved the parties' stipulated motion on a briefing schedule in this matter, (Dkt. 14), and the parties have briefed the issues.[7] On November 7, 2013, the Court heard oral argument on the briefs, and the matter is ripe for review.

## STANDARD OF REVIEW

The IDEA directs the Court to "receive the records of the administrative proceeding[,] hear additional evidence at the request of a party[, and base] its decision on the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C). Thus, "Congress intended the courts to make bounded, independent decisions—bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court…." *Town of Burlington v. Mass. Dep't of Educ.*, 736 F.2d 773, 791 (1st Cir. 1984), *aff'd sub nom. Burlington Sch. Comm. v. Mass. Dep't of Educ.*, 471 U.S. 359 (1985).

---

[6] The voluminous administrative record in this case was compiled into an electronic copy by HO Litteneker. This electronic copy was provided to the Court on a CD rather than being filed on CM/ECF. (Dkt. 12.) The CD includes four subfolders: (1) administrative "pleadings" including HO Littenker's various orders, (2) Respondent's (MSD's) exhibits, (3) Petitioner's (M.A.'s Parents') exhibits, and (4) a hearing transcript. The administrative pleadings and exhibits are individually numbered, and the transcript is organized in typical fashion with page and line numbers. Citations to administrative pleadings and exhibits will include the record's docket number in this case, an abbreviated description of the subfolder, the document number within that subfolder, and page numbers if necessary. For example, page 5 of MSD's Eligibility Report, which is Respondent's Exhibit 708, is cited as follows: (Dkt. 12, Resp.'s Ex. 708 at 5.)

[7] The Court directed both parties to inform the Court as to whether they would request consideration of additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii) and whether they believed an evidentiary hearing would be necessary. As discussed below, M.A.'s Parents requested the Court consider additional evidence, but their briefing on this point is not well-developed. (Dkt. 15 at 3-4.) M.A.'s Parents also are equivocal on the need for an evidentiary hearing. (*Id.*) MSD did not specifically request consideration of additional evidence but reserved the right to do so at a later time. (Dkt. 16 at 6.) The Court concludes an evidentiary hearing is not necessary.

Although the usual deferential standard for administrative appeals does not apply to IDEA cases, full de novo review is not appropriate. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1473 (9th Cir. 1993) (adopting *Town of Burlington*, 736 F.2d at 790-91). The United States Supreme Court has recognized that courts lack the expertise to formulate educational policy, an area traditionally reserved to state policymakers and education experts. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207-08 (1982). Accordingly, the district courts must give "due weight" to the HO's decision and must not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Van duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (9th Cir. 2007) (quoting *Rowley*, 458 U.S. at 206). Ultimately, the "amount of deference accorded the hearing officer's finding increases where they are thoughtful and careful." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995).

As is generally the case in administrative appeals, "[t]he party challenging the administrative decisions bears the burden of proof in seeking review in the district court." *Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1398-99 (9th Cir. 1994), *superseded by statute on other grounds*, IDEA, Pub. L. No. 105-17, 111 Stat. 37. Because M.A.'s Parents seek reversal of the administrative decision, they bear the burden of proof.

## DISCUSSION

M.A.'s Parents allege that HO Litteneker's decision upholding MSD's ineligibility determination is "clearly erroneous." (Dkt. 1 ¶ 69.) Specifically, M.A.'s Parents argue HO Litteneker erred by excluding certain evidence and testimony that the Court now should consider as additional evidence. Further, M.A.'s Parents claim MSD violated an

assortment of the IDEA's procedural protections, most notably the requirement that school districts provide parents a meaningful opportunity to participate in the eligibility evaluation. But the crux of Parents' appeal is that MSD and HO Litteneker arbitrarily ignored clear evidence that M.A. is eligible for special education.

On this point, M.A.'s Parents argue that M.A. was denied FAPE guaranteed by the IDEA because MSD and HO Litteneker selectively focused on M.A.'s academic successes. Notwithstanding his passing grades, Parents claim M.A.'s Asperger's disorder and related conditions cause substantial academic, social, and life skill deficits that necessitate special education. According to his parents, M.A.'s ability to "script" his interactions with teachers makes MSD's reliance on M.A's classroom behaviors and *academic* successes inappropriate. In contrast, M.A.'s Parents maintain the extensive record of testing and observation by independent experts demonstrates substantial *educational* deficits that entitle M.A. to special education.

Ninth Circuit precedent directs the Court to apply the *Rowley* educational benefit standard in special education eligibility cases. *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1107 (9th Cir. 2007). The *Rowley* decision—which provides the definitive interpretation of FAPE under the IDEA—involved a deaf child who was eligible for and receiving both special education and related services under an IEP. 458 U.S. 176. The Supreme Court held that a child with a disability receives FAPE when he or she has "sufficient support services to permit the child to benefit educationally…." *Id*. at 203. For that reason, the Court held that the child—who received speech therapy, was provided a hearing aid, advanced from grade to grade in the general curriculum, but who was not

provided with a full-time sign-language interpreter—was not denied FAPE. *Id.* at 210.
The Court emphasized that FAPE is not a "potential-maximizing" education but, instead,
a "basic floor of opportunity." *Id.* at 202, n.23.

Judicial review under the IDEA has both procedural and substantive dimensions.
According to *Rowley*, the general inquiry under 20 U.S.C. § 1415 is twofold. First, the
Court must determine whether MSD "complied with the procedures set forth in the Act."
*Id.* at 206. Second is the substantive inquiry: whether M.A. received educational benefit
in the general classroom without special education. *Hood*, 486 F.3d at 1107 (citing
*Rowley*, 458 U.S. at 203-04). As explained below, this substantive analysis turns on
Idaho's special education eligibility criteria. However, the Court first will address M.A.'s
Parents' request to consider additional evidence before analyzing their procedural and
substantive arguments.

**1.      Request to Consider Additional Evidence**

During the due process hearing before HO Litteneker, M.A.'s Parents moved for
admission of testimony and exhibits from the hearing conducted by HO Price in the *D.A.-
320* proceeding, two administrative hearings under § 504 in the *D.A.-119* proceeding, and
the state criminal proceedings against M.A.. Parents also sought to compel production of
the Vineland Scales of Adaptive Behavior test protocol. All of these matters were
considered by HO Litteneker in the context of Parents' Motion to Admit Testimony and
Exhibits from Prior Proceedings, Motion to Compel, and Motion for Reconsideration.
(Dkt. 12, Pldgs. 17, 19, 33.) HO Litteneker denied the Motion to Compel and
conditionally denied the motion to admit prior exhibits and testimony. On

reconsideration, HO Litteneker noted M.A.'s Parents "did not offer any authority, only argument and a touch too much hyperbole" and concluded "there is no connection to the issue raised in this consolidated matter… and there does not appear to be an efficient mechanism to parcel out the relevant and non-relevant testimony or exhibits from the prior proceedings…." (Dkt. 12, Pldg. 56 at 3-4.)

M.A.'s Parents contend HO Litteneker improperly excluded proffered evidence and limited the "scope of the testimony and exhibits presented solely to the question of what MSD considered in its determination of eligibility, rather than what MSD should have known." (Dkt. 15 at 5.) As a proposed remedy, M.A.'s Parents request that the Court consider, as "additional evidence," testimony by Dr. Barbara Webb and Dr. Craig Beaver, as well as certain test protocols and witness testimony concerning events before August 2011.

### a. *Additional Evidence Under the IDEA*

Once an IDEA appeal is before the district court, the Act directs the court to "hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C)(ii). "But not all evidence is 'additional evidence.'" *E.M. v. Pajaro Valley Unif. Sch. Dist.*, 652 F.3d 999, 1004 (9th Cir. 2011). Additional evidence is "non-cumulative, relevant, and otherwise admissible." *Id.* at 1005. The Court has discretion to determine what constitutes additional evidence in the context of this case, but the Court also must "be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo." *Ojai,* 4 F.3d at 1473. It is M.A.'s Parents burden to establish that the proffered evidence meets the definition above.

**b.**    ***M.A.'s Parents Have Not Demonstrated the Proffered Evidence Qualifies as Additional Evidence***

M.A.'s Parents concede that "the record before the Court contains sufficient evidence to permit the Court to find M.A. eligible, the Court is fully informed regarding the evidence before it, that time is of the essence in resolving this case, and therefore that an evidentiary hearing is not necessary in this matter." (Dkt. 15 at 3-4.) On this shaky foundation, M.A.'s Parents pile conclusory statements about the impropriety of HO Litteneker's decision to exclude certain evidence. But notably absent from Parents' request is an explanation of why the proffered evidence is relevant, non-cumulative, and otherwise admissible. Instead, M.A.'s Parents invite the Court to scour the voluminous records of at least four other proceedings to confirm their unelaborated contention that the evidence *is* relevant. A brief review of the record demonstrates otherwise.

Craig Beaver, Ph.D., examined M.A. in conjunction with his criminal proceedings and during his incarceration at the Ada County Juvenile Detention Center. MSD notes that Dr. Beaver never observed M.A. in the school setting, he has not assessed or seen M.A. in almost four years, and his reports in M.A.'s criminal proceeding have been sealed by state court order. Further, the IEE, which is incorporated in MSD's eligibility report, discusses Dr. Beaver's findings. (Dkt. 12, Resp.'s Ex. 708 at 222.) The passage of time and the circumstances of Dr. Beaver's evaluations (criminal proceedings) suggest they are not relevant to this proceeding. M.A.'s Parents offer no explanation to counter this conclusion.

Parents also proffer testimony by Dr. Barabara Webb, who prepared the IEE of M.A. and testified in both *D.A.-320* and *D.A.-119*. Six of Dr. Webb's reports, including the IEE and its various amendments, appear in MSD's eligibility report. (*Id.* at 168-268.) Nevertheless, M.A.'s Parents claim Dr. Webb's prior testimony should be considered as additional evidence "particularly in light of [her] unavailability." (Dkt. 15 at 5.) This claim is puzzling because HO Litteneker specifically permitted witnesses to testify out of order and via telephone provided they were sworn, could be identified, and that the witness state who and what documents are in the room with them. (Dkt. 12, Pldg. 32 at 4.) Despite this largess, Dr. Webb did not appear, by telephone or otherwise, to testify. Moreover, HO Litteneker addresses Dr. Webb's various reports at length in his decision. (Dkt. 1-3 at 20.) Thus, Dr. Webb's prior testimony appears to be cumulative of evidence in the record—a record Parents argue is sufficient to find M.A. eligible.

Last, M.A.'s Parents claim the Hearing Officer erroneously found irrelevant the Vineland test protocols and testimony related to occurrences before August 2011. While the prior testimony could, if shown, be relevant and non-cumulative, Parents make no such showing. Rather, M.A.'s Parents cite to excluded testimony from A.C., M.A.'s peer mentor at Centennial High School, as if the relevance of this testimony is self-evident. (Dkt. 19 at 10.) Parents' request for admission of the Vineland protocols suffers from a similar infirmity—the assumption that an unembellished claim of "error" automatically renders the protocols relevant, non-cumulative, and otherwise admissible. M.A.'s Parents have not shown their proffered additional evidence was improperly excluded by HO

Litteneker or otherwise qualifies as additional evidence under Ninth Circuit precedent. Therefore, the Court denies Parents' request to consider this additional evidence.

2.    **Procedural Adequacy**

M.A.'s Parents allege MSD committed a variety of procedural errors in determining M.A. was not eligible for special education. However, the only substantial argument on the procedural front is that MSD infringed on Parents' right to participate in the eligibility evaluation. The remaining procedural allegations are just that— unsupported recitations of the many issues raised in the due process proceedings. (*See* Dkt. 1 ¶ 9.) For example, M.A.'s Parents alleged MSD violated the IDEA's "Child Find" obligations, did not conduct a timely evaluation, and failed to evaluate M.A. in all areas of suspected disability. (*Id.*) Although these allegations are not independently supported with argument or legal authority, M.A.'s Parents claim they "continue to assert those areas in this case." (Dkt. 15 at 5 n.1.) But, as the Court has already stated that, a claim of error with nothing more does not entitle Parents to relief.

"Procedural flaws do not automatically require a finding of a denial of FAPE." *W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992) ("*Target Range*"). On the other hand, "procedural inadequacies that result in the loss of educational opportunity, or seriously infringe on the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE." *Id.* Although the *Target Range* court addressed the adequacy of an IEP, the Court finds this standard also applies in the eligibility context for two reasons. First, the IDEA affords similar procedural protections at the eligibility stage, including parental consent and

participation requirements. 20 U.S.C. § 1414(b)(1), (4). Second, in *Hood v. Encinitas Union Sch. Dist.*, the Ninth Circuit endorsed the use of the *Rowley* standard for eligibility cases, 486 F.3d at 1107, and the *Target Range* procedural error test likewise depends on a loss of educational opportunity.

### a. *M.A.'s Parents Meaningfully Participated in the Eligibility Process*

The IDEA places a premium on parental participation at both the eligibility stage and in the formulation of an IEP. *See Shapiro v. Paradise Valley Unified Sch. Dist. No. 69*, 317 F.3d 1072, 1078 (9th Cir. 2003) ("The Act imposes upon the school district the duty to conduct a meaningful meeting with the appropriate parties."). Indeed, the IDEA's procedural protections for parents are "critical" to carrying out its purposes. *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 891 (9th Cir. 2001). Here, M.A.'s Parents claim that MSD's conduct in this case "would render parental participation in the IEP eligibility process completely pointless." (Dkt. 19 at 3.)

There is no dispute that M.A.'s Parents—particularly his mother, D.A.— actively participated in the eligibility team meetings. In fact, MSD's eligibility report includes a verbatim copy of a four-page statement of M.A.'s strengths and weaknesses, which D.A. presented to the eligibility team on February 16, 2012. (Dkt. 12, Resp.'s Ex. 708 at 2-5.) HO Litteneker's findings further highlight the extensive record of D.A.'s active participation in the eligibility process. (Dkt. 1-3 at 28, 37-38, 40-42.) The record clearly demonstrates that MSD included M.A.'s Parents in the eligibility process and considered their input. Thus, M.A. was not denied FAPE on the basis of inadequate parental participation.

Moreover, the parties agree that, while the IDEA requires school districts to consider parental input, the Act does not require districts to "acquiesce" to parents. (Dkt. 19 at 2 (quoting Dkt. 16 at 10).) Indeed, a "difference in educational philosophy" between parents and school districts is not a denial of meaningful participation because the school district is obligated to consider more than just the parents' input. *Ms. S. v. Vashon Island Sch. Dist.* 337 F.3d 1115, 1133 (9th Cir. 2003). Nevertheless, M.A.'s Parents contend their involvement in the eligibility process was "little more than window dressing." (Dkt. 19 at 3.) This argument is not an attack on MSD's procedures so much as it is a claim that MSD's substantive ineligibility determination was contrary to evidence provided by M.A.'s Parents and their experts. As such, this claim is effectively subsumed in Parents' substantive claims.

### b. *Other Alleged Procedural Errors Do Not Amount to a Denial of FAPE*

The consolidated due process proceeding before HO Litteneker involved 11 contested issues, some of which HO Litteneker noted were not clearly identified. Parents' arguments in this proceeding also do not clearly delineate the issues before the Court. In particular, M.A.'s Parents obscurely claim that they "continue to assert" certain, unspecified issues in this case without independent briefing or clear identification. (Dkt. 15 at 5 n.2.) As stated above, M.A.'s Parents bear the burden of proof. A party cannot carry this burden with vague assertions alone. Parents have not shown how the sundry procedural issues decided below and merely reasserted here deprived M.A. of educational

opportunity or otherwise denied him FAPE. Therefore, the Court will not overturn HO Litteneker's conclusions on these matters.[8]

## 3.    Substantive Adequacy

In essence, M.A.'s Parents claim a preponderance of the evidence establishes that M.A. needs special education. According to M.A.'s Parents, MSD and HO Litteneker's analysis overemphasized M.A.'s academic successes and failed to consider how his condition broadly affects his educational performance. Parents argue that MSD and HO Litteneker arbitrarily disregarded relevant evidence provided by Parents and their experts, which indicates M.A.'s significant academic, social, and life skill deficits. As a result, Parents maintain that MSD ignored M.A.'s demonstrated need for special education. Parents conclude these substantive flaws entitle M.A. to compensatory education and other relief.[9]

As a preliminary matter, it is noteworthy that school districts must provide FAPE under both § 504 and the IDEA, but "the two requirements contain significant differences." *Mark H. v. Lemahieu*, 513 F.3d 922, 933 (9th Cir. 2008). During oral argument before the Court, MSD suggested that M.A. received FAPE under the IDEA

---

[8] After thorough and careful consideration of the record, HO Litteneker concluded: (1) Parents' "Child Find claim is essentially subsumed by the Parents [sic] claim that the Student was not properly evaluated" (Dkt. 1-3 at 35); (2) MSD conducted a timely special education eligibility evaluation (*Id.* at 36); (3) MSD "clearly evaluated the child in all areas of suspected disability," including autism, emotional disability, and speech language disorder (*Id.* at 37); and (4) MSD did not predetermine ineligibility (*Id.* at 40).

[9] M.A.'s Parents also assert, without more, that the Court should grant relief because MSD failed to: (a) develop an IEP for M.A., (b) provide supplementary aides and services, and (c) address transition services. (Dkt. 15 at 2.) But MSD points out, and the Court agrees, that a decision on these issues is premature because M.A. must be found eligible for special education before he would be entitled to any of these services. *See* 34 C.F.R. § 300.320. Thus, the Court will not address these matters further.

because a jury found M.A. was not denied FAPE under § 504. *See D.A.-119*, Dkt. 127 (D. Idaho July 26, 2013) (Special Verdict). If anything, the reverse is true: "the U.S. DOE's § 504 regulations distinctly state that adopting a valid IDEA IEP is sufficient but not necessary to satisfy the § 504 FAPE requirements." *Mark H.,* 513 F.3d at 933. (citing 34 C.F.R. §§ 104.33(b)(2), 104.36). Further, a denial of FAPE under the IDEA does not necessarily amount to a denial of FAPE under § 504. *Id*. The two statutes have complementary but distinct purposes. Hence, the verdict in *D.A.-119* is not dispositive of Parents' IDEA claims.

The IDEA's implementing regulations obligate school districts to base eligibility decisions on a variety of "relevant functional, developmental, and academic information about the child, including information provided by the parent…." 20 U.S.C. § 1414(b)(2)(A). Further, a determination that a student is eligible for special education cannot be based on "any single measure or assessment as the sole criterion for determining whether a child is [eligible]." *Id.* § 300.304(b)(3). In other words, an eligibility determination is a team effort, requiring consideration of a broad range of information provided by both the school district and parents. As one court observed, "a physician cannot simply prescribe special education; rather, the Act dictates a full review by an IEP team composed of parents, regular education teachers, special education teachers, and representatives of the local educational agency." *Marshall Joint Sch. Dist. No. 2 v. C.D.*, 616 F.3d 632, 640-41 (7th Cir. 2010) (citing 20 U.S.C. §§ 1414(d)(1)(B), (d)(3)(C)).

MSD's comprehensive, 268-page Eligibility Report, (Dkt. 12, Resp.'s Ex. 708), amply demonstrates compliance with these requirements. The report details evaluations conducted by the Boise School District during M.A.'s incarceration. It also summarizes numerous in-school assessments by MSD personnel—including teachers, MSD's special education supervisor, a school psychologist, a speech-language pathologist, and an occupational therapist—after M.A. returned to Centennial High School. In addition, the report discusses at length out-of-school observations by D.A. and the findings of the independent professionals who contributed to Dr. Webb's IEE. The IEE is based on, and MSD's Eligibility Report incorporates, assessments by independent professionals, including an occupational therapist, a speech-language pathologist, a neuropsychologist, and a behavioral specialist. It is clear MSD's evaluators reach different conclusions than M.A.'s Parents and their experts. But it is equally clear MSD considered and based its decision on relevant functional, developmental, and academic information—including the IEE and parental input. With this extensive body of evidence in mind, the Court now considers whether M.A. meets Idaho's special education eligibility criteria.

a.     *Idaho's Special Education Eligibility Criteria*

One of the IDEA's purposes is "to ensure that all children with disabilities have available to them a free appropriate public education [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). However, the IDEA does not mandate special education for all children diagnosed with a disability. Only children who meet the Act's definition of a "child with a disability"

qualify for special education and related services. *Id.* § 1414(b), (d). The Act's

definitional section states that a child with "autism, … other health impairments, or

specific learning disabilities" is a "child with a disability" when the child, "by reason [of

the disability], *needs* special education and related services." *Id.* § 1401(3)(A) (emphasis

added).

The parties agree that the relevant eligibility criteria appear in the Idaho Manual. [10]

"State standards that are not inconsistent with federal standards are also enforceable in

federal court." *Target Range*, 960 F.2d at 1483. Accordingly, federal courts routinely

apply states' eligibility criteria to determine whether a child needs special education. *See,*

*e.g., Hood*, 486 F.3d at 1104 (applying California criteria for "specific learning

disability" and "other health impairments"). The Idaho Manual sets out a "three-prong

test for eligibility":

> 1. the eligibility criteria established by the state for a specific disability are
> met;
> 2. the disability must have an adverse impact on the student's education,
> **and**
> 3. the student must need special education in order to benefit from his or
> her education.

Idaho Manual at 44. These criteria are not inconsistent with the general eligibility criteria

provided in the IDEA or its implementing regulations. *See* 20 U.S.C. § 1401(3)(A); 34

C.F.R. § 300.8. And there is no dispute that M.A. meets the criteria for a specific

---

[10] Available at: http://www.sde.idaho.gov/site/special_edu/manual_page.htm (last
accessed Jan. 3, 2014).

disability, namely autism.[11] However, the parties vigorously dispute whether M.A.

satisfies the second and third criteria.

**b.      *M.A.'s Condition Does Not Have an Adverse Impact on His Education***

Education, as M.A.'s Parents correctly note, is a broad concept. Reflecting this

understanding, the Idaho Manual states:

> The term "adverse effect on educational performance" is broad in scope.
> An adverse effect is a harmful or unfavorable influence. Educational
> performance includes both academic areas (reading, math, communication,
> etc.) and nonacademic areas (daily life activities, mobility, pre-vocational
> and vocational skills, social adaptation, self-help skills, etc.). Consideration
> of all facets of the student's condition that adversely affect educational
> performance involves determining any harmful or unfavorable influences
> that the disability has on the student's academic or daily life activities.

Idaho Manual at p. 44-45. M.A.'s Parents contend HO Litteneker committed reversible

error by improperly conflating M.A.'s academic performance with his educational

performance.

MSD's Eligibility Report and HO Litteneker's decision highlight M.A.'s overall

success in the general curriculum at Centennial High School. This is entirely appropriate

because, when a disabled student "is being educated in the regular classrooms of a public

school system, the achievement of passing marks and advancement from grade to grade

will be one important factor in determining educational benefit." *Rowley*, 458 U.S. at 207

n.28. Indeed, M.A.'s grades are generally average to above average, he passed the Idaho

Standards Achievement Test (a prerequisite for high school graduation), and he otherwise

---

[11] Although M.A.'s Parents assert the school district failed to evaluate M.A. in all areas
of suspected disability, their arguments center on M.A.'s autism. Indeed, M.A.'s Parents do not
specifically address Idaho's eligibility criteria for disabilities other than autism.

qualified to graduate from high school, in part by completing a senior project.[12] In addition to standard academic subjects, M.A. passed a drama class and several professional technical classes, including Business Essentials, Personal Finance, Web Design, and Broadcasting. (Dkt. 12, Resp.'s Ex. 708 at 32-33.) Tellingly, the eligibility team found "[M.A.] is being exposed to the same transition/vocational/occupational experiences as his senior peers and [M.A.'s] performance in these areas is at a level similar to his typical peers." (*Id.* at 33.) Nevertheless, M.A.'s Parents allege the "Hearing Officer found, without any support in the record, that the 'District adequately assessed the Student's transitional skills and pre-vocational skills.'" (Dkt. 1 ¶ 98.)

But Parents do not dispute M.A. took and passed a number of courses that taught life and pre-vocational skills. While M.A.'s Parents insist educational performance is a broad concept, they characterize almost all graded activity as exclusively academic. Yet MSD points out classes like broadcasting and the senior project involved group work and public speaking. In other words, the record demonstrates M.A. participated in, and passed, classes with significant nonacademic pre-vocational, vocational, and self-help skill components. Parents do not counter this evidence so much as they focus on evidence of M.A.'s autistic behaviors.

There is considerable evidence that M.A.'s autism can affect his ability to appropriately interact with peers, work outside of established routines, and remain fully

---

[12] The record discloses average to above average grades in math and English (mostly B's, some C's). (Dkt. 12, Resp.'s Ex. 708 at 31-32.) The one exception to this trend is an F in Algebra II during Fall 2011. (*Id.*) HO Litteneker heard substantial testimony regarding this poor grade. The record supports the conclusion that Algebra II was not the proper placement for M.A. and that he was urged by school staff to take a math modeling course instead.

engaged in the classroom environment. For instance, an independent behavioral specialist noted that M.A. uses journaling as a way to withdraw from class discussions. M.A.'s fellow student and assigned peer mentor, A.C., testified to M.A.'s difficulty in social situations. And M.A.'s mother, D.A., recounts similar difficulties in social situations, as well as rigid thinking and significant troubles with life skills like navigating the bus system or managing finances. The record also discloses that M.A. exhibits autistic behaviors such as perching, self-isolation, and difficulty understanding personal space. D.A.'s remarks to the eligibility team crystalize Parents' position: "on paper he is smart, but that doesn't mean he can do simple things." (Dkt. 12, Resp.'s Ex. 708 at 5.)

That M.A. has a form of autism or that his behaviors are consistent with this diagnosis is not in dispute, however. HO Litteneker noted that "[t]here was no element of the manifestations of [M.A.]'s autism that was not observed, considered, reviewed and testified to by the classroom personnel and [MSD] professional staff at Centennial High." (Dkt. 1-3 at 39.) Yet none of the MSD assessments found behaviors that impeded M.A.'s participation in the general education curriculum. And, to the extent these in-school assessments did not address autism's effect on M.A.'s educational performance, the IEE and D.A.'s personal observations fill in the gaps with numerous out-of-school assessments. But the question is not whether M.A. could benefit from services related to self-help skills or socialization. Rather, the question is whether M.A.'s autism manifests itself in a way that adversely affects his educational performance in the general curriculum.

On the whole, the evidence compels a negative answer to this question. The Supreme Court's admonition that the IDEA requires only a "basic floor of opportunity" fortifies this conclusion. *Rowley*, 458 U.S. at 200. To the extent M.A.'s Parents argue M.A.'s individual weaknesses demonstrate an adverse effect on educational performance, they rely on a definition of "adverse effect" that is in tension with the teaching of *Rowley*. Indeed, a finding that *any* weakness in *any* academic or nonacademic area constitutes an adverse effect on educational performance would turn the IDEA's floor into a ceiling over the heads of all but the most gifted children. While D.A. and the IEE extensively documented M.A.'s weaknesses, largely based on assessments outside of school, the consensus among M.A.'s day-to-day teachers was that M.A. possessed sufficient academic and nonacademic skills to participate, and in some cases to excel, in the general curriculum. And while the record indicates M.A. has significant social and pragmatic difficulties, he also has overcome these difficulties to the extent necessary to navigate a 1,700-student high school and meet all graduation requirements. Thus, the Court is not persuaded that M.A.'s disability has an adverse effect on his educational performance.

c.    ***M.A. Does Not Need Special Education to Benefit from His Education***

Even if M.A.'s Parents could demonstrate an adverse effect on M.A.'s educational performance, they must further demonstrate special education is necessary for M.A. to receive educational benefit. "Special education is specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including instruction conducted in the classroom…." 20 U.S.C. § 1401(29). Critically, under the IDEA's implementing regulations, a disabled child is not a "child with a disability" if he

or she "only needs a related service and not special education." 34 C.F.R.

§ 300.8(a)(2)(i). "Related services" are typically "transportation and such developmental,

corrective, and other supportive services… as may be required to assist a child with

disability to benefit from special education." *Id.* § 1401(26). In Idaho, special education

relates to instruction, including speech-language therapy,[13] that is specially designed to

allow a disabled child to receive educational benefit. On the other hand, related services

are therapies and assistance that enable the child to receive instruction. But a child is

eligible for related services only if that child is first found eligible for special education.

The distinction is key, because M.A.'s high-functioning autism appears to

necessitate related services far more than it does special education. For example, the

"Recommendations to Ensure FAPE" in Dr. Webb's IEE largely focus on M.A.'s need

for related services. Dr. Webb's recommendations devote about one and one half pages to

M.A.'s academic and speech-language instruction needs and about three pages (and far

more recommended time) to "related services."[14] (Dkt. 12, Resp.'s Ex. 708 at 203-06.)

All told, less than 30% of the 4,084 hours Dr. Webb recommended as compensatory

education falls within Idaho's definition of "special education." (*Id.* at 214.) Testimony

---

[13] The federal regulations allow the States to consider "speech-language pathology services, or any other related service," as "special education" if the state rules so provide. 34 C.F.R. § 300.39(a)(2)(i). Idaho's rules only incorporate speech-language pathology services into the definition of special education. IDAPA 08.02.03.109.01.g.

[14] Dr. Webb recommends a total of 790 hours of academic services (math, writing, and study skills, and "social supports") and 450 hours of speech language therapy, services that would presumably qualify as "special education." Further, Dr. Webb recommends 2,844 hours of services that fall within the definition of "related services." These related services include behavioral, occupational, adaptive, and pre-vocational therapies as well as time for assistive technology instruction and work with an "intervention coordinator." (Dkt. 12, Resp.'s Ex. 708 at 214.)

by D.A. and assessments by third-party evaluators demonstrates M.A. has significant needs with regard to behavior, socialization, and self-sufficiency. But M.A.'s need for related services to address these deficits is immaterial if he does not need special education.

M.A.'s Parents contend professional observations included in the IEE establish M.A.'s need for special education. MSD argues its evaluations prove otherwise. Ultimately, this raises the issue of credibility. Here, HO Litteneker found more credible testimony by MSD's professional evaluators and M.A.'s classroom teachers because their testimony was "consistent" and Parents' third-party experts were "infrequent classroom observers." (Dkt. 1-3 at 40.)

Consistent with the established rule of deference to the fact finder, the Ninth Circuit has recognized that "a HO who receives live testimony is in the best position to determine issues of credibility." *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 889 (9th Cir. 2001). Indeed, the court in *Amanda J.* found the district court committed legal error by not deferring to the HO's credibility determinations. *Id.* at 889 n.11. M.A.'s Parents nevertheless attack HO Litteneker's credibility determinations and argue the Court should overturn them.

HO Litteneker's concern about the extent of the independent experts' contact with M.A. in the school setting was well-founded. While it is true that Parents' third-party experts have extensive, specialized experience with autism, their contact with M.A. was limited compared to that of MSD personnel. For example, Jan Hill, who taught M.A. in every semester he attended, and completed, at Centennial High School, spent

approximately 600 hours with him. (Dkt. 12, Hill Test., 1512:8-18.) With regard to M.A.'s participation in her advanced broadcasting class, Hill noted that M.A. was one of the "best editors" and repeatedly volunteered to anchor the daily news broadcast to the student body. (*Id*. 1513-14.) By contrast, third-party behavioral expert Christine Curry observed M.A. for ten hours over two days both at home and at school. (Dkt. 12, Resp.'s Ex. 708 at 27-28.) Curry concluded, based on these observations, that M.A. would not be able to perform a variety of tasks, such as writing an essay, organizing a schedule, or completing work in a timely manner. (*Id.*) But these conclusions are directly contradicted by Hill's testimony. Not only did M.A. write an "amazing" script for his final project, he did not require any special modifications to the advanced broadcasting curriculum and exhibited strong organizational skills. (Dkt. 12, Hill Test., 1514:14-19, 1518:5-15.)

In a similar vein, the parties debate the weight that should be accorded to the two speech-language pathologists who testified—Mondae Robinson for MSD and Rebecca Thompson on behalf of Parents. M.A.'s Parents criticize Robinson's opinions as based on "informal observations," (Dkt. 15 at 10), but the eligibility report notes that she assessed M.A.'s communication skills both formally (classroom) and informally (lunch, pep rally, and in class). (Dkt. 12, Resp.'s Ex. 708 at 21-22.) Robinson noted no dysfluencies and generally appropriate interactions with teachers and students both in and out of class. (*Id*.) Thompson observed M.A. during one formal classroom visit and weekly therapy sessions. (*Id*.) Based on these observations, Thompson concluded M.A. sometimes exhibited inflexible thinking, socially awkward behavior, and limited dysfluency. (*Id*.) But when pressed at the due process hearing, Thompson stated: "I don't think I would

have said he is eligible…. My observation, and data, and testing would lean me toward

eligibility. But I'm not a therapist in the school." (Dkt. 12, Thompson Test., 84:5-9.)

M.A.'s Parents nevertheless allege Thompson's testimony supports eligibility

notwithstanding Robinson's contrary findings.

 HO Litteneker identified, and the record discloses, several additional

inconsistencies between the conclusions of Parents' experts and those of MSD personnel.

Yet Parents argue HO Litteneker inappropriately focused on the quantity of evidence

presented by MSD and thus disregarded quality evidence in favor of M.A.'s eligibility.

There is no ignoring the fact that HO Litteneker considered a mountain of evidence from

MSD personnel, D.A., and Parents' third-party experts before affirming MSD's

ineligibility determination. The eligibility report is exhaustive and totals 268 pages with

all the attached assessments. There are over 2,000 pages of hearing transcripts, covering

10 days of testimony. Both parties offered over 100 exhibits each. The size and depth of

the record is frankly remarkable.

 The record shows M.A. met the requirements to graduate from high school

without specially designed instruction. Although some teachers provided

accommodations such as shorter assignments or longer deadlines, such adjustments are

contemplated by M.A.'s § 504 Accommodation Plan. (Dkt. 12, Resp.'s Ex. 506.) The

testimony of M.A.'s teachers establishes that M.A. was held to the same standards as

other general education students. Under these standards, M.A. passed, and sometimes

excelled in, core subjects, as well as classes emphasizing pre-vocational and life skills.

He also demonstrated proficiency in standardized testing and his senior project.

In response, M.A.'s Parents speculate that M.A.'s accomplishments are the result of third-party support and therapies obtained at Parents' expense. Apart from the obvious difficulty of disentangling the effect of these third-party services, the record shows some of these therapies were provided under Medicaid, (Dkt. 12, Thompson Test., 68:3-17), or pursuant to a court order in the criminal proceeding against M.A.. (Dkt. 12, Whitney Test., 473:21-25.) Thus, a preponderance of the evidence in the record persuades the Court that, despite his autism, M.A. does not need special education.

## CONCLUSION

The Court concludes MSD did not deny M.A. FAPE by finding him ineligible for special education. Parents have not persuaded the Court that evidence excluded by HO Litteneker qualifies as additional evidence within the meaning of the IDEA. Nor is the Court persuaded that any asserted procedural errors amounted to a denial of FAPE. HO Litteneker's substantive findings are thoughtful, careful, and reflect application of the correct legal standard. The Court's independent review of the record indicates M.A.'s Parents did not carry their burden to warrant reversal. Therefore, the Court will affirm HO Litteneker's finding that MSD appropriately determined M.A. was not eligible for special education.

## ORDER

Based on the foregoing, the Court being otherwise fully advised in the premises,

**IT IS HEREBY ORDERED** that Hearing Officer Edwin Litteneker's decision, which found MSD appropriately determined M.A. was not eligible for special education under IDEA, is **AFFIRMED**. Final judgment dismissing this action with prejudice shall be entered in this case accordingly.

Dated: **January 06, 2014**

Honorable Candy W. Dale
United States Magistrate Judge